FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

SEP 17 2010

Stephan Harris, Clerk
Cheyenne

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| BOARD OF COUNTY COMMISSIONERS of the COUNTY OF PARK, STATE OF WYOMING, <br><br> Petitioner, <br><br> INTERNATIONAL SNOWMOBILE MANUFACTURERS ASSOCIATION, INC., <br><br> Intervenor, <br><br> vs. <br><br> UNITED STATES DEPARTMENT OF THE INTERIOR; KEN SALAZAR, in his official capacity as Secretary of the United States Department of the Interior; JON JARVIS, in his official capacity as the Director of the National Park Service, and MICHAEL SNYDER, in his official capacity as Intermountain Regional Director, National Park Service, <br><br> Respondents. <br><br> NATIONAL PARKS CONSERVATION ASSOCIATION, <br><br> Respondent-Intervenor. <br><br> and | Case No. 09-CV-262J <br> Consolidated with |

BOARD OF COUNTY COMMISSIONERS )
OF THE COUNTY OF PARK, STATE OF )
WYOMING, )
                                       )
      Petitioner, )
                                       )
      vs. )     Case No. 09-CV-272J
                                       )
UNITED STATES DEPARTMENT OF THE )
INTERIOR; KEN SALAZAR, in his official )
capacity as Secretary of the United )
States Department of the Interior; )
JON JARVIS, in his official capacity )
as the Director of the National Park )
Service, and MICHAEL SNYDER, in his )
official capacity as Intermountain )
Regional Director, National Park Service, )
                                       )
      Respondents. )

## ORDER ON INTERVENOR-DEFENDANT NATIONAL PARKS CONSERVATION ASSOCIATION'S "MOTION TO DISMISS OR TO TRANSFER PURSUANT TO 18 U.S.C. § 1404(a)"

Intervenor-Defendant National Parks Conservation Association's ("NPCA") Motion to Dismiss or to Transfer Pursuant to 18 U.S.C. § 1404(a) has come before the Court for consideration. The Court, having considered the motion and all of the responses in opposition thereto, all pleadings of record and submissions in support of the parties' positions, the applicable law, FINDS and ORDERS as follows:

2

## Background

The above captioned consolidated actions seek review of a regulation (the "2009 Rule") adopted by the National Park Service ("NPS") relating to the use of snowmobiles in Yellowstone National Park and Grand Teton National Park, among other things. Movant National Parks Conservation Association ("NPCA") argues the petition[1] should be dismissed or transferred to the D.C. District Court because (1) the petition for review is effectively a collateral attack on the D.C. District Court decision and the Petitioners ask that this Court make rulings contradictory to that decision and nullify it in important respects; and (2) Petitioners lack standing to bring this petition for review, asserting neither a state nor a subdivision thereof has standing to sue the federal government for the benefit of the citizens of the state or subdivision.  NPCA also asserts the same claims and seeks the same relief with respect to the consolidated action, *Park County v. Dep't of Interior,* 09-CV-272J.

The Tenth Circuit Court of Appeals has set out the background of this case in *State of Wyoming v. United States Dep't of Interior*, 587 F.3d 1245 (10th Cir.

---

[1]For purposes of convenience, the two separate petitions of the State of Wyoming and Park County will be referred collectively to as "the petition" unless otherwise specified, as NPCA makes the same arguments with respect to both petitioners and has encompassed the issues raised by Park County in its motion arguments.

2009). In that case, the Court was reviewing a decision by the Wyoming District Court issuing an interim remedial order allowing 720 snowmobiles to enter Yellowstone National Park ("YNP") each day, after the D.C. District Court had invalidated governing National Park Service regulations. The Tenth Circuit found the issue to be moot where the National Park Service ("NPS") had promulgated a temporary rule allowing 318 snowmobiles in YNP on a daily basis.

This case has a complicated and lengthy history, involving cases brought in the D.C. District Court and the Wyoming District Court as far back as 1997. The first action was brought in the D.C. District Court in 1997 by snowmobiling opponents, which was settled and a rule was adopted in 2001. Then, snowmobile proponents challenged that rule in the Wyoming District Court, resulting in another settlement and a different rule adopted in 2003. That rule was challenged in the D.C. District Court by snowmobile opponents, resulting in an order invalidating that rule and reinstating the 2001 rule. Snowmobile proponents again challenged the 2001 rule in the Wyoming District Court, leading to an order invalidating the 2001 rule. In 2004, another rule was adopted, which was challenged in both courts, but vacated by neither. That rule was in effect until adoption of a new rule in 2007.

4

The most recent action was related to the regulations adopted in 2007

("2007 Rule"). This rule permitted 540 recreational snowmobiles per day at

YNP. The rule was challenged by the NPCA and others in the D.C. District

Court. The State of Wyoming and others challenged the 2007 Rule, but those

challenges were filed in the Wyoming District Court. September 15, 2008, the

D.C. District Court ruled in the cases before it, finding the 2007 Rule to be

arbitrary and capricious, unsupported by the record and contrary to law.

The D.C. District Court stated:

> [T]he Court finds that the Winter Use Plan, as codified in the
> Final Rule and explained in the 2007 ROD, is arbitrary and
> capricious, unsupported by the record, and contrary to law. In
> contravention of the Organic Act, the Plan clearly elevates use over
> conservation of park resources and values and fails to articulate
> why the Plan's "major adverse impacts" are "necessary and
> appropriate to fulfill the purposes of the park." NPS Policies § 143,
> NPS fails to explain how increasing snowmobile usage over current
> conditions, where adaptive management thresholds are already
> being exceeded, complies with the conservation mandate of the
> Organic Act. In violation of the APA, NPS also fails to provide a
> rational explanation for the source of the 540 snowmobile limit.
>
> Furthermore, the FEIS in support of the Plan does not provide
> the decisionmaker with a clear analysis of the alternatives that
> NEPA requires. Chief among its failings, the FEIS relies on
> admittedly inaccurate sound modeling data, employs a park-wide
> metric that dilutes the Plan's impacts on soundscapes and air
> quality, and utterly fails to explain why none of the seven
> alternatives would constitute "impairment" or unacceptable
> impacts. According to NPS's own data, the WUP will increase air

pollution, exceed the use levels recommended by NPS biologists to protect wildlife, and cause major adverse impacts to the natural soundscapes in Yellowstone.   Despite this, NPS found that the plan's impacts are wholly "acceptable," and utterly fails to explain this incongruous conclusion.   Put simply, the WUP provides "no rational connection between the facts found and the choice made." *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006).   While the Court will defer to an agency's exercise of expertise, the "Court will not defer to the agency's conclusory or unsupported assertions." *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004).

Accordingly, Plaintiffs' Motion for Summary Judgment is **GRANTED** AND Defendants' Cross-Motion for Summary Judgment is **DENIED.**   The Winter Use Plan, 2007 ROD, and 2007 FEIS are vacated and remanded to the agency for proceedings consistent with this opinion.   An appropriate order accompanies this Memorandum Opinion.

*Greater Yellowstone Coalition v. Kempthorne*, 577 F. Supp.2d 183, 210 (D.D.C.

Sept. 15, 2008).   Intervenor NPCA appealed this November 2008 order,

asserting that the D.C. District Court lacked subject matter jurisdiction.   The

intervenor International Snowmobile Manufacturers Association ("ISMA") also

appealed that decision.

On November 7, 2008, the Wyoming District Court entered its "Order

Implementing Temporary Remedy and Granting Motion to Intervene." *State of

Wyoming et al. v. United States Dep't of Interior, et al.,* Consolidated Cases:

Case No. 07-CV-0319-B and Case No. 08-CV-0004-B.   The Wyoming Court

6

stated:

> Although this court would have upheld the final rule promulgated by the NPS, it did not have the opportunity to do so. The D.C. District court determined that the final rule was "arbitrary and capricious, unsupported by the record, and contrary to law" prior to the completion of a hearing on the same held in this Court. Greater Yellowstone Coal v. Kempthorne, No. 07-211, 07-2112, 2008 WL 4191133, at *24 (D.D.C. September 15, 2008). Although urged to do so by the Federal Respondents, this court refuses to make a finding contrary to that of the D.C. District court. A contrary finding would provide no immediate relief to the Federal Respondents. The D.C. District court has ordered that the final rule be vacated and remanded back to the agency. This court has "no power or authority to amend, modify, or revoke an order of another United States District Judge." In re Pusser, 123 F. Supp. 164, 167 (E.D.S.C. 1954). Therefore, even if the final rule were upheld here, the D.C. District court order would still require that the rule be vacated and remanded. As a result, although this court may disagree with the D.C. District court, it refuses to disturb the order that has already been laid down by that Court.

\* \* \* \*

b.  Remedy

This court now faces the issue of the remedy that should be implemented while the NPS promulgates a new rule in compliance with the D.C. District court's order.

\* \* \* \*

Based on the case law, and this court's equitable power, the court finds that equity requires reinstatement of the 2004 temporary rule to provide some semblance of order in this disordered and confusing state of affairs.

Id. at 10-11, 12-15.  Pursuant to that order, and perceiving a regulatory void, the Wyoming District Court directed the NPS to adopt an interim rule permitting 720 snowmobiles per day until the NPS could adopt a replacement rule.

Thereafter, on December 9, 2008, NPS complied with Judge's Brimmer's order, and permitted 720 snowmobiles per day at YNP, pursuant to the November 2008 order.

That same day, December 9, 2008, the Greater Yellowstone Coalition and others (not including the NPCA), filed in the D.C. District Court seeking to invalidate the 2008 Rule, asserting that rule was inconsistent with the D.C. District Court's order invalidating the rule permitting 540 snowmobiles per day, elevating recreational uses above "conservation of park resources and values and fails to articulate why the Plan's 'major adverse impacts' are 'necessary and appropriate to fulfill the purposes of the park.'" *Greater Yellowstone Coalition v. Kempthorne*, 577 F. Supp.2d 183, 210.  The D.C. District Court ordered NPS to implement a new rule consistent with the Court's opinion.

On November 15, 2009, the NPS published notice in the Federal Register announcing that it intended to finalize a rule on or before November 15, 2009, permitting 318 snowmobiles per day.  74 Fed. Reg. 36640 (July 24, 2009).  The 2009 Rule did become effective November 20, 2009.  The D.C. District Court

8

rescheduled its hearing on pending cross motions for summary judgment on November 18, 2009.

July 24, 2009, the State of Wyoming, Park County and ISMA sought to enjoin the NPS's adoption of the 2009 Rule in the Wyoming District Court in the then-pending actions before Judge Brimmer. A hearing was held August 18, 2009. The motion was denied when Judge Brimmer determined he had lost jurisdiction over the matter because of the pendency of the NPCA's appeal.

After the November 20, 2009 adoption of the 2009 Rule, the D.C. District Court dismissed the *Greater Yellowstone Coalition* action pending in that court as moot. The Minute Order of December 3, 2009 stated: "Upon consideration of ... the Notice of Publication of Federal Register Notices indicating that the National Park Service has published a Final Rule governing winter visitation and certain recreational use in Yellowstone National Park for the 2009-2010 and 2010-2011 seasons, and the parties' representations [in pleadings] and responses to . . . the Order to Show Cause, this case is hereby DISMISSED as moot." Docket Entry 19, Exhibit J, attached to NPCA's motion to dismiss or transfer 19.

On November 24, 2009, the Tenth Circuit Court of Appeals found NPCA's appeal moot, as the NPS had adopted the 2009 Rule, and dismissed and

9

vacated the November 2008 Order and remanded with instructions to the district court to dismiss for lack of subject matter jurisdiction. *State of Wyoming v. United States Dep't of Interior*, 587 F.3d 1245, 1255 (10th Cir. 2009).

On November 24, 2009, the State of Wyoming filed its Petition for Review in this Court. In its petition for review, the State asserted that the 2009 Winter Use Plan violated NEPA and its implementing regulations, the APA, the Yellowstone National Park Act, the National Park Service Organic Act, and the United States Constitution. December 2, 2009, Park County filed its separate Petition for Review of the 2009 Rule in this Court. Its allegations are similar to those asserted by the State against the federal respondents. The two cases have been consolidated for all purposes, with 09-CV-262J designated as the lead case.

## Contentions of the Parties

In its Motion to Dismiss or Transfer, NPCA argues that comity requires that this Court not consider a collateral attack on the decision of another federal court and not hear a case that would interfere with that other court's processes. It argues that the petitions in this action constitute collateral attacks on the

10

D.C. District Court decision.  It also asserts the NPS has not completed its proceedings on remand from that decision, and thus, the petitioners' claims ask this Court to interfere with the NPS's ongoing compliance with the D.C. District Court decision.   The history of multiple litigations engendered by the Yellowstone snowmobile issue demonstrates that the only way to bring certainty and end the litigation is for a single court to oversee the dispute.  NPCA argues it would waste judicial resources for this Court to consider the issues with which the D.C. District Court has been deeply involved.

NPCA also argues that petitioners lack standing to bring these actions. It asserts a state has no standing, as *parens patriae* on behalf of its citizens to bring an action against the federal government, citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 610 n. 16 (1982); *State ex rel. Sullivan v. Lujan*, 969 F.2d 877, 883 (10th Cir. 1992).  It argues the same principles apply with respect to Park County, where the County is not asserting its own interests and because the federal government is presumed to represent the County's citizens.

NPCA urges that the only basis for claimed standing by the State is protection of the State and County's citizens, claiming that the 2009 Rule "arbitrarily deprive[s] citizens of meaningful access to the Parks, particularly

11

citizens of limited means, with no commensurate benefit to Park resources."
Wyoming Petition ¶ 1. Thus, NPCA contends that the matter should be
dismissed because the State of Wyoming and Park County lack standing to
assert their claims and for lack of subject matter jurisdiction.

The State of Wyoming opposes the motion. It asserts the 2009 winter
use plan ("WUP") significantly and arbitrarily reduces the number of
snowmobiles permitted to enter the parks on a daily basis, was promulgated
without regard to the NPS's own scientific conclusions about the effects of
snowmobile access in the Parks, without regard to legal mandates requiring the
NPS to maximize access to the Parks, and without consideration of other
reasonable alternatives. It contends that because the plans adversely affect
numerous State interests, it sought judicial review in this venue, where its
claimed injuries will occur, where the Parks are located, where the plans will be
implemented and where the NPS is competent to defend itself.

The State contends that NPCA voluntarily intervened in this action and
seeks to move it to a venue it alone finds more convenient. The request to
transfer is improper, because NPCA waived any right to object to this venue and
because it is not inconvenient, and no other court is considering the validity of
the 2009 WUPs. It also contends that Wyoming brought the litigation to protect

12

its own proprietary and sovereign interests and that it was not brought as *parens patriae* for the benefit of its citizens.

The State argues there are no comity issues presented in this action where identical complaints have not been filed in two different federal courts. NPCA has not asserted there is identical litigation or any litigation related to the same agency action pending in another court.  This is an entirely different administrative action where APA review is limited to review of the administrative record.  Additionally, Wyoming was not a party to the previous litigation in the District of Columbia.  The issues being raised by the State are different issues than those raised by the plaintiffs in that litigation and Wyoming has never had an opportunity to have its unique issues decided by any other court.

As to the standing arguments, Wyoming agrees that it has no standing as *parens patriae* on behalf of its citizens to bring an action against the federal government.  However, it contends it has standing to protect the State's own proprietary and sovereign interests.  It claims the 2009 WUPs cause injuries directly to those interests and therefore it has standing to bring this litigation. Wyoming asserts it will suffer economic and environmental injuries as a result of the 2009 rule(s) which are concrete injuries clearly traceable to the 2009

13

WUP and redressable by a decision of this Court.

Wyoming asserts it has both proprietary and sovereign interests in the health of its tourism industry and that it receives millions of dollars in tax revenues generated from travelers to the Parks and generated from within the Parks.  The State claims that limitations on the daily number of snowmobiles, commercial guide requirements and continued uncertainty for future seasons discourage and reduce the number of persons seeking access to the Parks via snowmobiles to the immediate economic detriment of the State, including winter visitor expenditures, claimed to exceed $450 million, and spending that generates jobs, as well as payroll associated with those jobs and tax revenues for local, county and state governments.[2]

Wyoming also contends that these limitations on snowmobile use in the Parks result in displacement impacts on adjacent national forests to the detriment of Wyoming, causing a significant increase in the management, grooming and trail upkeep responsibilities of the Wyoming Trails program.  The

---

[2]Petitioners have not broken out from their claimed tax revenue losses how much is actually attributable to snowmobile use in the Parks.   The documents attached to NPCA's reply regarding sales tax collections in Park County actually show increases from FY 2007 to FY 2009 in Retail Trade, Accommodation, and Food Services Sales tax collections, as well as increases in total use tax collections. See e.g., Docket Entry 33 Exhibit F, Declaration of Timothy Stevens, Docket Entry at 33-6, and Docket Entry 33-19 at 40, 58, 68.

14

national forest lands are at or near their carrying capacity for winter snowmobile use and as a result the Forest Service is likely to impose additional restrictions on those lands, interfering with the mission of the Trails program.

Wyoming asserts it has a significant sovereign interest in the management of the fishery at Jackson Lake and in air quality in the Parks. The winter use plans conflict and interfere with Wyoming's regulatory authority over air quality within its borders. Additionally, Wyoming contends that it has been a participant in the NEPA process and has an interest in the NPS's procedural compliance with NEPA. It has submitted comments which have been ignored throughout the process and argues that its interests have been adversely affected by NPS's non-compliance with NEPA procedures.

Wyoming argues it satisfies the prudential standing doctrine's zone of interests test. The purpose of NEPA is to "protect the environment," citing *Wyoming Sawmills, Inc. v. United States Forest Service,* 179 F. Supp.2d 1279, 1299 (10th Cir. 2001). Wyoming claims environmental interests in wildlife, fisheries, trails and air quality which are affected by the WUPs. It also has an interest in providing recreational and aesthetic opportunities for its citizens and tourists who are adversely affected by unreasonable limitations on access to the Parks. It contends that Wyoming's substantive and procedural injuries are

15

caused directly by the 2009 WUPs and can be addressed by a judgment from this Court.

Park County argues the consolidated cases should not be transferred in that there is no active case involving winter use in the D.C. District Court. A petitioner's choice of venue should not be disturbed when the party moving for a transfer is an intervenor that voluntarily brings itself into an already existing action. It suggests this is a transparent matter of forum shopping by NPCA. In this case, there are no public interest factors supporting a decision to transfer, such as administrative difficulties caused by court congestion, local interest in adjudicating local disputes, the unfairness of burdening citizens is an unrelated forum with jury duty, and the avoidance of unnecessary problems in conflict of laws.

As to the standing inquiry, Park County asserts it has suffered an injury in fact to concrete and particularized interests. It contends that sales tax dollars deriving from the tourist economy, which includes winter use in Park County, flow to Park County's general fund and allow the County to meet its statutory duties in providing public services. Because of its proximity to Yellowstone, many people desire to live in Park County. Park County advertises its proximity to Yellowstone as one of its major amenities. Park County cannot

16

prevent subdivision development, but when it does occur, it must provide additional services, such as law enforcement, planning and zoning obligations and road maintenance on county roads – services paid for in part from sales tax revenues arising from visitation in Yellowstone, including winter use.   Park County is harmed by resulting reduction in sales tax revenues arising from that winter use.   Park County also asserts its ability to advertise its resources is diminished when those resources, including Yellowstone and particularly winter use in Yellowstone, are diminished.   It is harmed in its ability to promote that resource as an aesthetic and environmental amenity.

As to the requirement that all snowmobilers be accompanied by a commercial guide, it is contended that this requirement has reduced interest in snowmobiling in Yellowstone and has also contributed to a reduction in sales tax collections. Park County contends that the harm from reducing snowmobile numbers arises from the NPS decision and would be redressable by a favorable decision requiring that the Park Service reevaluate its decision to reduce numbers and to, in fact, increase numbers.   The decision is tied to NPS's interpretation of the Organic Act, by elevating conservation of resources over the interest in public use of the Park.

No response in opposition to the motion has been filed by the intervenor-

17

petitioner International Snowmobile Manufacturers Association ("ISMA"). However, it has filed a notice of joinder in the briefs of the State of Wyoming and Park County, Wyoming.  For purposes of deciding the instant motion, the Court assumes that the joinder was also intended to join in the responses of the State of Wyoming and Park County with respect to the motion to dismiss or transfer.

The federal defendant has not taken a position on the motion to transfer, except to submit that the D.C. District Court's September 15, 2008 Opinion and Order cannot serve as the basis for finding that the D.C. District Court has continuing jurisdiction over the claims asserted here.   No preference is expressed for proceeding in one district court over the other. The government's response to the motion to dismiss or transfer does not address the standing issues, although it was addressed in their oral argument and briefing on the merits.

Now pending  before the Court is the intervenor NPCA's motion to dismiss or transfer to the District of Columbia District Court.

18

## Discussion

### 1. Motion to Transfer

Title 28 U.S.C. § 1404(a) provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

The trial court has broad discretion as to whether to grant a change of venue pursuant to § 1404(a). Scheidt v. Klein, 956 F.2d 963, 965 (10th Cir. 1992). The party seeking the transfer bears the burden of establishing that the existing forum is inconvenient. Id.; Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1515 (10th Cir. 1991). However, as a general rule unless the balance of the inconvenience is strongly in favor of the movant, the plaintiff's choice of forum should rarely be disturbed. Scheidt, 956 F.2d at 965.

The following factors are pertinent to a § 1404(a) determination:

> . . . the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of existence of questions arising in the area of conflict of laws; that advantage of having a local court determine questions of local law; and, all other considerations of a practical nature that make a trial easy, expeditious and economical.

Chrysler, 928 F.2d at 1516 (citing Texas Gulf Sulphur Co. v. Ritter, 371 F.2d 145, 147 (10th Cir. 1967)).

The Court has considered the above factors and finds that the intervenor NPCA's motion for a transfer should be denied. The petitioners' choice of forum will not be disturbed in this case as considerations of convenience do not dictate that either forum, Wyoming or the District of Columbia, will be more convenient than the other.

The factors considered include, but are not limited to, the following. The instant action was filed in Wyoming. This case could have been brought in several different districts, including Wyoming or the District of Columbia. The petitioners' litigation in this case was originally commenced in Wyoming. This is an administrative record review case, so the considerations pertinent to convenience of witnesses are of little consequence. The United States District Court for the District of Wyoming sits in Cheyenne, Casper, Lander and Jackson, Wyoming. The United States District Court for the District of Columbia sits in and is located in the Washington, D.C. metropolitan area. Wherever this action proceeds, it is likely some or all of the parties and their counsel may be required to travel at some point in the litigation. Counsel participating in this case, and thus the parties on both sides of this litigation, will incur cost and

20

expense in any venue. The cost of proving the case will be equally burdensome to both sides. Cases on the docket of the United States District Court for the District of Wyoming move along in a fairly expeditious manner. Docket congestion does not appear to favor one forum over the other. Additionally, there is no question relative to the choice of law. This matter is governed by federal law and does not involve any advantage arising out of a local court's consideration of matters of local law. NPCA voluntarily elected to intervene in this action, knowing it was filed in the District of Wyoming. Furthermore, there is presently no pending active case in the District of Columbia, that case having been dismissed as moot. Exhibit J, attached to NPCA's motion to dismiss or transfer, Docket Entry 19. There is no apparent basis to support a claim of continuing jurisdiction in the District of Columbia that would support a transfer of the instant action to that district.

Additionally, there are no considerations of comity that suggest this Court should transfer the case to the D.C. District Court. The parties herein are not the same parties and their claims asserted were not represented by the parties in that litigation. The D.C. District Court dismissed its case as moot. The Court perceives no barriers to proceeding in this district.

NPCA has not carried its burden of demonstrating that the existing forum

21

chosen by petitioners should be disturbed in this case.  The motion for a change of venue or transfer will be denied.

## 2.  Standing

The party invoking federal jurisdiction bears the burden of establishing the following elements:

First, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is (a) concrete and particularized, . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]'" . . . Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be "fairly . . . trace[-able] to the challenged action of the defendant, and not . . . t[he] result [of] the independent action of some third party not before the court." . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561, 112 S.Ct. 2150, 2136 (1992) (citations omitted).

Importantly, each element "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the

22

litigation.

> At the pleading stage, general factual allegations of injury resulting
> from the defendant's conduct may suffice, for on a motion to
> dismiss we "presum[e] that general allegations embrace those
> specific facts that are necessary to support the claim."

Id. at 561, 112 S.Ct. at 2137.  Additionally, standing is to be determined at the

time of commencement of suit.  Id., at 571, 112 S.Ct. at 2142, n.4 and n.5.

The questions of standing are more difficult than the issues concerning

venue in this case.  The intervenor asserts that the State of Wyoming and Park

County do not have standing in this case, as the interests of the State are not

sufficient to support a *parens patriae* action.  The State and Park County agree

and concede that *parens patriae* standing is not a sufficient basis to support a

finding of standing in this case.  However, the State and Park County contend

they have significant interests arising under the APA and NEPA that do support

standing in this case.

"Because the National Environmental Policy Act does not contain a private

right of action for those seeking to enforce its procedural requirements, a

plaintiff must rely on the Administrative Procedures Act as the basis for its

action and, therefore, in addition to satisfying the constitutional standing

requirements, a plaintiff must establish it is "'adversely affected or aggrieved

23

. . . within the meaning of a relevant statute' by some final agency action." *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448 (10th Cir. 1996).

In this case, the State and County assert they are not, as *parens patriae*, bringing these actions on behalf of its citizens, but are instead asserting their own sovereign interests or proprietary rights. The State has asserted NEPA and non-NEPA claims, asserting procedural injuries conferring standing for purposes of this action. By way of example, Wyoming has alleged a NEPA violation by failing to consider a reasonable range of alternatives or provide a reasoned explanation for the "undue restriction on snowmobiles entries in spite of its own scientific evidence demonstrating that more snowmobiles could be permitted without causing unacceptable impacts or impairment to park resources." It also asserts the Park Service failed to take a hard look at the environmental consequences of allowing a reasonable percentage of snowmobiles entries to be accompanied by a non commercial guide, the preferred alternative as a whole, allocating entries into the parks on a per season basis, allowing snowmobiles on the Continental Divide Snowmobile Trail and by allowing more than 25 snowmobiles per day. It also contends that the State was not allowed to participate in the NEPA process as a cooperating agency or meaningfully

participate in the development of the revised preferred alternative and that the agency did not give meaningful consideration to the State's comments.

Similarly, Park County complains that the 2009 WUP will result in reduced tax dollars deriving from a tourism economy, which includes winter use in Yellowstone.  As well, it asserts that its proximity to YNP is one of its major amenities.   Acknowledging that Park County cannot prevent subdivision development, it states that when development does occur it must provide additional services including law enforcement, planning and zoning and road maintenance from added traffic on county roads.  All of this is paid for, in part, by sales tax revenues arising from winter use visitation in Yellowstone.  Part of this money is used to advertise and when those resources are diminished the ability to promote Park County as an aesthetic and environmental amenity is harmed, and also limits tax dollars brought into the County.

Standing is a question of law for the court to determine.  *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 447 (10th Cir. 1996).   The doctrine of standing "'is an essential and unchanging part of the case-or-controversy requirement of Article III.'"  Id., quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1984). The irreducible constitutional minimum of standing contains the three elements outlined above.

The Supreme Court, in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-562, 112 S.Ct. 2130, 2136-2137 (1984), stated:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction-and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," ASARCO Inc. v. Kadish, 490 U.S. 605, 615, 109 S.Ct. 2037, 2044, 104 L.Ed.2d 696 (1989) (opinion of KENNEDY, J.); see also Simon, *supra*, 426 U.S., at 41-42, 96 S.Ct., at 1925, 1926; and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. E.g., Warth, *supra*, 422 U.S., at 505, 95 S.Ct., at 2208. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish. Allen, *supra*, 468 U.S., at 758, 104 S.Ct., at 3328; Simon, *supra*, 426 U.S., at 44-45, 96 S.Ct., at 1927; Warth, *supra*, 422 U.S., at 505, 95 S.Ct., at 2208.

Lujan v. Defenders of Wildlife, 504 S.Ct. 555, 560-563, 112 S.Ct. 2130, 2136-

2137 (1992). See also <u>Rio Hondo</u>, 102 F.3d at 447.

The State and County must establish an injury in fact.

In considering these claims it is important to remember the procedural nature of a National Environmental Policy Act claim. The National Environmental Policy Act was enacted to protect and promote environmental quality. 42 U.S.C. § 4331(a-c) (1994). To ensure this protection, the National Environmental Policy Act establishes 'action forcing' procedures the agencies must follow, such as requiring an agency to prepare either an environmental impact statement or a supplemental environmental impact statement under certain circumstances. 42 U.S.C. § 4332(2)(C)(i-v); 40 C.F.R. § 1502.9(c)(I)(i).   These prescribed procedures guarantee the agency will take a 'hard look' at the environmental consequences of its actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976). By focusing the agency's attention on the environmental consequences of its actions, the National Environmental Policy Act "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 1845, 103 L.Ed.2d 351 (1989). While the National Environmental Policy Act itself does not mandate the particular decisions an agency must reach, it does mandate the necessary process the agency must follow while reaching its decisions.  <u>Id.</u> at 350, 109 S.Ct. at 1845-46.

An agency's failure to follow the National Environmental Policy Act's prescribed procedures creates a risk that serious environmental consequences of the agency action will not be brought to the agency decisionmaker's attention. The injury of an increased risk of harm due to an agency's uninformed decision is precisely the type of injury the National Environmental Policy Act was designed to prevent. Thus, under the National Environmental Policy Act, an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation

for injury in fact under Article III. *Douglas County v. Babbitt*, 48 F.3d 1495, 1499-1501 (9th Cir. 1995), *cert. denied*, 516 U.S. 1042, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996); *City of Davis v. Coleman*, 521 F.2d 661, 671 (9th Cir. 1975).

Although the National Environmental Policy Act accords procedural rights to those with an interest in protecting the environment, standing under Article III also requires a plaintiff be among the injured. Morton, 405 U.S. at 734-35, 92 S.Ct. at 1365-66. To fully establish injury in fact, a plaintiff must be able to show that a separate injury to its concrete, particularized interests flows from the agency's procedural failure. *Defenders of Wildlife*, 504 U.S. at 572, 112 S.Ct. at 2142. In *Defenders of Wildlife*, the Supreme Court said:

> We have consistently held that a plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy.

Id. at 573-74, 112 S.Ct. at 2143-44. Therefore, to establish injury in fact for purposes of Article III, a plaintiff must not only show that the agency's disregard of a procedural requirement results in an increased risk of environmental harm, but a plaintiff must also show the increased risk is to the litigant's concrete and particularized interests. Id. at 573 n. 8, 578, 112 S.Ct. at 2143 n. 8, 2145; *Douglas County*, 48 F.3d at 1500. To demonstrate that the increased risk of harm injures the plaintiff's concrete interests, the litigant must establish either its "geographical nexus" to, or actual use of the site where the agency will take or has taken action such that it may be expected to suffer the environmental consequences of the action. *Douglas County*, 48 F.3d at 1501 (stating that the "geographic nexus" test is equated with the "concrete interest" test of *Defenders of Wildlife*, 504 U.S. at 573 n.

8, 112 S.Ct. at 2143 n. 8); *Coleman*, 521 F.2d at 670; see also *Catron County*, 75 F.3d at 1433.

Furthermore, because standing is not "an ingenious academic exercise in the conceivable," at the summary judgment stage, injury in fact requires "a factual showing of perceptible harm." *Defenders of Wildlife*, 504 U.S. at 566, 112 S.Ct. at 2139 (quoting *Students Challenging Regulatory Agency Procedures*, 412 U.S. at 688, 93 S.Ct. at 2416). A plaintiff may not merely allege it can imagine circumstances in which it could be affected by the agency action. The risk of environmental harm to the litigant's concrete interests due to the agency's uninformed decisionmaking must be actual, threatened, or imminent, not merely conjectural or hypothetical. [FN4 omitted] *Defenders of Wildlife*, 504 U.S. at 560, 112 S.Ct. at 2136.

Ultimately then, the injury in fact prong of the standing test of Article III breaks down into two parts: (1) the litigant must show that in making its decision without following the National Environmental Policy Act's procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm; and (2) the litigant must show that the increased risk of environmental harm injures its concrete interests by demonstrating either its geographical nexus to, or actual use of the site of the agency action.

Id., 102 F.3d at 448-450 (emphasis supplied).

Stated somewhat differently, the Tenth Circuit has stated in another

context:

To establish an injury-in-fact from failure to perform a NEPA analysis, a litigant must show: 1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent environmental harm; and 2) that this increased risk of environmental harm injures

its concrete interest. *Comm. to Save Rio Hondo v. Lucero*, 102 F.3d 445, 449 (10th Cir.1996). In the context of a NEPA claim, the harm itself need not be immediate, as "the federal project complained of may not affect the concrete interest for several years." See id. at 449, n. 4.

*Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002). The

opinion continues:

> To establish an increased risk of environmental injury, Sierra Club does not need to prove that the mining project will surely harm the environment, and that it will go forth because of the easement. See *Comm. to Save Rio Hondo*, 102 F.3d at 452 (holding that "The National Environmental Policy Act was not intended to require the plaintiff to show with certainty, or even with a substantial probability, the results of agency action; those examinations are left to an environmental impact statement"). Sierra Club need only show that, in making its decision without following the NEPA and ESA procedures, the agency created an increased risk of actual, threatened, or imminent environmental harm. See *id.* at 449.
>
> Sierra Club has presented sufficient facts to show that the easement granted by the DOE is a necessary step in the construction of a road to advance the expansion of the mining project, which has the potential of harming the environment. This is sufficient to establish an increased risk of environmental harm. Also, Sierra Club has alleged facts sufficient to show that increased risk of harm emanating from the uninformed decision of the DOE to grant the easement affects Sierra Club's "concrete interest." A litigant shows an injury to its concrete interest by demonstrating either a geographical nexus to or actual use of the site of agency action. Id. Sierra Club established that its members have worked to protect both the Buffer Zone's wetlands and the "threatened" Preble's Jumping Field Mouse, and have used the area in the Buffer Zone for recreational and educational purposes. As a result, Sierra Club has alleged facts sufficient to

establish injury-in-fact emanating from failure of the DOE to perform the procedural reviews under the NEPA and the ESA.

Further, the alleged injury is fairly traceable to the failure of the DOE to conduct an NEPA and ESA analysis. An injury under the NEPA results "not from the agency's decision, but rather from the agency's uninformed decisionmaking." Id. at 452.

Finally, the alleged injury is redressable by judicial intervention. Although the DOE argues that the injury is not redressable because it has no power over WAI's mining operations, this argument misses the point. The alleged injury is the potential environmental impact of an uninformed decision to grant the easement. This injury is redressable by a court order requiring the DOE to undertake an NEPA and ESA analysis in order to better inform itself of the consequences of its decision to grant the easement. Thus, Sierra Club has standing to complain of the DOE's failure to follow the procedural requirements of the NEPA and the ESA.

Id., 287 F.3d at 1265-1266.

The State argues that it has satisfied the injury in fact prong of the standing analysis, asserting it has proprietary and sovereign interests in the health of its tourism industry, receipt of tax revenues generated from within the National Parks and by individuals traveling to the Parks.  The State alleges it has a direct and substantial economic interest in the operation and management of the parks. Limitations on the daily number of snowmobiles, commercial guide requirements and continued uncertainty for future seasons discourages and reduces the number of persons seeking access to the national

31

parks via snowmobiles to the immediate economic detriment of the State of Wyoming.  Wyoming states it spends money promoting winter tourism in the parks, and those expenditures "translate into revenues for the State." Document 23 at 16.  It asserts the limitations result in displacement impacts on the adjacent national forests to the detriment of Wyoming, causing a significant increase in the management, grooming and trail upkeep responsibilities of the Wyoming Trails program.  The State also argues that the adjacent national forest lands are at or near their carrying capacity for winter snowmobile use.  When that carrying capacity is exceeded as a result of displacement from the Parks, the Forest Service is likely to impose additional restrictions on those lands, interfering with the mission of the Trails program.

Wyoming contends this displacement into national forests interferes with Wyoming's interest in the management of wildlife within its borders, in the management of the Jackson Lake fishery, and in the air quality in the parks. It asserts further that Wyoming has an interest in the NPS's procedural compliance, having been involved in the NEPA processes leading to the 2009 WUPs.  It states its comments have been ignored, without citing to the administrative record, and that this failure has adversely affected the State's concrete interests.

32

In the instant case, the State offers, among other things, in support of its opposition to the motion to dismiss or transfer the affidavit of Bradley Hill, the Wyoming Trails program manager.   Hill opines that the 2009 WUPs have displaced snowmobiles from the National Parks to the adjacent national forest lands, adversely affecting the Trails program.   The Trails program was established to enhance snowmobile trails and create recreational opportunities for snowmobiling within the State of Wyoming.   Funds generated by the registration of snowmobiles are used by the Trails program to maintain, groom and sign trails and to print maps and materials to advertise and promote the program within Wyoming.   The program also provides snowmobiles and other equipment for the Forest Service to carry out patrols and enforcement on the snowmobile trail system in the national forests in Wyoming.   The affidavit avers, in part, that the 2009 Winter Use Plans have displaced hundreds of snowmobiles from YNP, Grand Teton National Park and the John D. Rockefeller, Jr., Memorial Parkway onto adjacent national forest lands in Wyoming and adversely affects the Trails program.   However, the materials now before the Court suggest that the claims included in this affidavit are perhaps rhetorical exaggeration, as there simply is no indication that "hundreds of snowmobiles" will be displaced into adjacent national forests.   Further, while the mission of

the Trails program, in part, is carried out by the Wyoming Department of State

Parks and Cultural Resources in cooperation with other agencies, ultimate

responsibility for management of federal National Forests lies with the United

States National Forest Service.[3],[4]   By way of commentary only, it is entirely

---

[3]Management of national forests is accomplished through broad, programmatic documents, forest plans, accompanied by an environmental impact statement and the public review process conducted in accordance with the National Environmental Policy Act.  "The Forest Plan must incorporate multiple forest uses, and thus coordinate the management of 'outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness.'  16 U.S.C. § 1604(e)(1)."  McKeen v. United States Forest Service, ___ F.3d ___, 2010 WL 2992388 (10th Cir., Aug. 2,  2010).

[4]On its website, the Wyoming Department of State Parks and Cultural Resources describes the Trails program, in part, as follows:  "Wyoming has over 8,500 miles of trails managed by a variety of agencies. Trail opportunities in Wyoming are many and diverse. Wyoming's trails are located in areas ranging from deep river canyons to high desert plains, to high mountain crags and alpine meadows, to community greenways. Hikers, bicyclists, equestrians, skiers, snowmobilers, historians, ORV (off road vehicle) riders and community pathway users all use Wyoming's statewide system of trails. Outdoor recreation has been an important part of the State's way of life for many years.

The State Trails Program does not own any property or directly control any trail, the Program partners with other land management agencies to maintain, create and provide funding and or labor and equipment for trails. An emphasis is placed upon the federal lands that host 98% of all trails in Wyoming. The State Trails Program is primarily funded through motorized user and registration fees - the Program is charged with administering the snowmobile and ORV program in Wyoming. Management of Non-Motorized Trails is a secondary role since other federal, state and local agencies are the

(continued...)

unclear to this Court how displacement into national forests from the national parks is an injury to the State or why allowing increased numbers of snowmobiles in the national parks is preferable.  It is clear from the express provisions in the final rule, and as reflected in the administrative record, that the NPS did consider air quality, air pollution and air emission requirements, effects on wildlife and soundscapes, snowmobile and coach routes, entry into Sylvan Pass and access through the East Entrance, and numerous comments regarding the same.  See e.g., Docket Entry 19-10.

The Hill affidavit also indicates that snowmobilers generate a significant amount of economic activity in Wyoming, including earned income for Wyoming residents, jobs and sales tax revenues, and will result in economic losses to the State of Wyoming.  If this is to be considered support for the petitioners' claimed bases for standing, it is insufficient as the injuries alleged are entirely speculative and conjectural.  The injuries alleged are not actual or imminent and are entirely hypothetical and conjectural.  There is no guarantee that the claimed tax revenues would be generated or that the claimed economic losses

---

[4](...continued)
primary non-motorized trail managers in Wyoming."
        http://wyotrails.state.wy.us/

would not occur if the relief sought by petitioners is granted.

The second affidavit offered is that of Michael D. Stone, of the Wyoming Game and Fish Department. He opines that the 2009 WUP will have significant impacts on winter fishing use of the Jackson Lake and will negate the benefits resulting from the Wyoming Game and Fish Department's long term management of the lake. The lake is managed jointly by the Bureau of Reclamation, the National Park Service, and the Wyoming Game and Fish, to coordinate the water, land and fish use of the lake. The "unreasonable and unnecessary restrictions on access to Jackson Lake by snowmachine[s] negate the benefits of decades of intensive management and will require future changes in management of the fishery. As long as there is snowmachine use in the Park, that use should also be available in more reasonable numbers on Jackson Lake." Stone Affidavit at ¶ 7. Further the affidavit opines:

> 8. In addition, all wildlife in Wyoming is the property of the State, and the Wyoming Game & Fish Department is responsible for managing that wildlife. When the National Park Service reduces snowmachine access to the National Parks, snowmachine use is displaced into the adjoining National Forests. When snowmachine use is displaced into the National Forests, snowmachine users encounter and disturb wildlife during the critical winter months at a greater rate. These displacement effects resulting from the 2009 Winter Use Plan interfere with the Wyoming Game & Fish Department's management of the wildlife in the adjoining National Forests and are likely to result in reduced survival rates for species

36

in these areas.

Stone Affidavit ¶ 8.  The State also attaches numerous comments submitted by the State regarding the Environmental Assessment ("EA") for the 2008 WUPs. The same comments pertain here as those with respect to the arguments concerning the claimed effect on the Trails program, with the ultimate responsibility for managing federal lands placed upon federal agencies, working in cooperation with other entities.[5]

From the foregoing, the Court concludes that the State has not alleged sufficient facts, at the pleading phase, *Lujan v. Defenders of Wildlife*, 112 S.Ct. at 2137, to establish that it has an injury to a concrete and particularized interest by demonstrating either a geographical nexus to or actual use of the site of agency action resulting in an increased risk of environmental harm.  Nor has it demonstrated that it has an interest independent of its citizens.[6]  The

---

[5]Based upon the submissions that are before the Court, there is nothing that would suggest the Wyoming Game and Fish is precluded by the terms and provisions of this interim Final Rule from continuing to manage the fishery in any way or that it cannot access the lake as necessary during the winter season to accomplish its particular management duties and responsibilities.

[6]There is discussion in the parties' submissions regarding the effect of the NPS Rule on outfitters and others similarly situated and the loss of income and revenues those individuals may suffer.  However, these are injuries to the interests of the outfitters themselves and others who may have standing to

(continued...)

37

allegations do not demonstrate that the injury is likely, as opposed to speculative, to be redressed by a favorable decision.   At the pleading phase a litigant can rest on the allegations of its pleadings, and the court must presume that general allegations embrace those specific facts necessary to support the claim,  id., only for purposes of standing at this point in this litigation, the pleading phase. Those general allegations do not support a finding of standing for the State of Wyoming in this case.

The same analysis obtains with respect to Park County.  In particular, it has only demonstrated an interest arising out of claimed loss of tourism and tax revenues generated by those coming through Park County with the intention to use and enjoy the Parks, as well as a claimed inability to advertise itself and its amenities arising out of the County's proximity to the park.   These are speculative and hypothetical economic interests which are not sufficient to demonstrate an injury to concrete interests independent of the County's citizens.[7]

---

[6](...continued)
assert their own interests.  Any injury the State claims on this basis would be asserted under the *parens patriae* doctrine on behalf of its citizens and does not support a finding of standing.

[7]While quite tenuous, in addition to loss of sales tax revenues, Park
(continued...)

The second prong of the test is that there must be a causal connection between the alleged injury and the conduct complained of – the injury has to be "'fairly . . . trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife, 112 S.Ct. at 2136.* Here one of the harms complained of is that the agency failed to comply with NEPA and engage in informed decisionmaking.  The plaintiff "'need trace the risk of harm to the

---

[7](...continued)
County asserts it is burdened with increased use and physical environmental impacts on the roads and lands in that area.  It plows and maintains the winter highway between the Beartooth Highway where it joins with the Chief Joseph Highway west to Pilot Creek, where it maintains a large parking area for snowmobiles.  It contends it has been harmed in its ability to promote the area as an "aesthetic and environmental amenity."  In addition to claims regarding loss of revenues, Park County has asserted procedural violations of NEPA, including but not limited to, failure to observe and give critical review of Park County's public comments in the context of its status as a cooperating agency, failure to adequately analyze an alternative allowing for allocation of snowmobile entries into YNP on a per season basis or a flexible daily basis as compared to a strict per day basis as it relates to maximum numbers in violation of NEPA; that the regulation exceeds the authority granted in the executive order upon which it is based, and thus rendering the final rule, to the extent it relies on that regulation, contrary to law.  Park County seeks remand to remedy violations and instructing the agency to make its decision based on what it perceives to be a proper interpretation and deference to National Park Service governing law, and setting aside and vacating portions of the final rule addressing daily limits so as to increase daily snowmobile limits and eliminate the commercial guide requirements.  The interests relied on in this regard are also speculative, hypothetical and not likely to be redressable by any decision that might be favorable to Park County.

agency's alleged failure to follow [NEPA's] procedures. Under [NEPA] an injury results not from the agency's decision, but from the agency's uninformed decisionmaking.'" *Jackson Hole Conservation Alliance v. Babbitt*, 96 F. Supp.2d 1288, 1294 (D.Wyo. 2000), quoting *Rio Hondo*, 101 F.3d at 452. Again, at the pleading phase, the Court finds petitioners' allegations are not sufficient as to the second prong. Furthermore, the Administrative Record, and the provisions of the Final Rules themselves belie the claims asserted in this regard.

The third prong of the Article III standing analysis "requires that it be "'likely,' as opposed to merely 'speculative,' that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 112 S.Ct. at 2136, quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 43, 96 S.Ct. 1917, at 1924, 1936 (1976).

> Compliance with the National Environmental Policy Act would avert the possibility that the Forest Service may have overlooked significant environmental consequences of its action. Under the National Environmental Policy Act, "the normal standards for redressability" are relaxed; a plaintiff need not establish that the ultimate agency decision would change upon National Environmental Policy Act compliance. *Defenders of Wildlife*, 504 U.S. at 572 n. 7, 112 S.Ct. at 2142 n. 7; *Catron County*, 75 F.3d at 1433. Rather, the Committee must establish, as it has, that its injury would be redressed by a favorable decision requiring the Forest Service to comply with National Environmental Policy Act's procedures. That the Forest Service may not change its decision to allow summertime operations at the Ski Area after preparing an

40

environmental impact statement is immaterial. *Catron County*, 75
F.3d at 1433; see also National Environmental Policy Act of 1969;
42 U.S.C. § 4332(2)(C)(i-v) (1988); 40 C.F.R. § 1502.9(c)(1)(i)
(1995).

*Committee to Save the Rio Hondo v. Lucero*, 102 F.3d at 1294.

At the pleading stage, the Court finds that petitioners' alleged procedural
injuries are not redressable. The claimed economic injuries are speculative, at
best, and also rely on asserting claimed citizen interests and tax revenue
interests that do not support standing. There is also little evidence in the
record before this Court that the agency made an uninformed decision in this
case that might require the NPS to engage in additional planning with respect
to this interim rule, even though the ultimate decision to implement the 2009
Final Rule as it currently stands might remain the same.

As to the ISMA, the intervenor may piggyback upon the standing of an
existing party to a case, provided that there is a "'justiciable case or
controversy at the point at which intervention is sought.'" City of Colorado
Springs v. Climax Molybdenum Co., 587 F.3d 1071, 1081 (10th Cir. 2009).
Those circumstances do not exist in this case.

The Court finds that the economic injuries alleged by both the State and
Park County with respect to loss of tax revenues and their respective claimed

economic injuries fail to satisfy the injury in fact and redressability prongs of the test for standing.   These are conjectural and hypothetical injuries and generalized grievances insufficient to confer standing.[8] Any relief this Court could grant would not guarantee the State or Park County any tax revenues or opportunities for benefit.   The allegations asserted in that regard are "conjecture based on speculation that is bottomed on surmise.  It ostensibly asserts public policy concerns, but on final analysis, the State's interest begins and ends with the royalties it is expected to receive."   *State of Wyoming v. Lujan*, 969 F.2d 877, 882 (10th Cir. 1992)(state alleging loss of royalty

-----

[8]"The allegation that tax revenues were reduced embodies a comprehensible harm to the economic interests of the state government. However, it appears to us likely that this is the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing.  [footnote omitted]  The parallel to the cases imposing very strict limits on taxpayer standing is imperfect, since it can not be said of the state that its economic interest is no different than those of many others.   Still, the unavoidable economic repercussions of virtually all federal policies, and the nature of the federal union as embodying a division of national and state powers, suggest to us that impairment of state tax revenues should not, in general be recognized as sufficient injury in fact to support standing.   By analogy to the taxpayer standing cases, it seems appropriate to require some fairly direct link between the state's status as a collector and recipient of revenues and the legislative of administrative action being challenged.   This would prevent standing in cases like the present one, where diminution of tax receipts is largely an incidental result of the challenged action."  *Commonwealth of Pennsylvania, By Shapp v. Kleppe*, 533 F.2d 668, 670-672 (D.C. 1976), *cert. denied*, 429 U.S. 977 (1976).

payments and injury by virtual of the removal of coal from its "coal bank," plaintiff may not convert federal courts into 'publicly funded forums for the ventilation of public grievances," quoting *Valley Forge*, 454 U.S. at 473, 102 S.Ct. at 759, and finding abstract injury insufficient, and that a favorable ruling "will not guarantee the State one nickel of coal leasing royalties from these lands.  There is only speculation and surmise that the State will ever receive any such royalties.")  This case is no different with respect to the loss of revenues and economic injuries alleged by both the State of Wyoming and Park County, which are not redressable and do not support a finding of standing on that basis.

As to the other claims, neither party's assertion regarding the NEPA claims withstand scrutiny.  NEPA establishes action forcing procedures that the agencies must follow and prescribes procedures that guarantee the agency will take a hard look at the environmental consequences of its actions. Committee to Save the Rio Hondo v. Lucero, 102 F.3d 445, 448 (10th Cir. 1996).  It also "ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  Id.  It does not mandate that particular decisions be reached by the agency.  Id.  Petitioners have not demonstrated any injury arising out of a

procedural failure to support a finding of standing.

As stated earlier, and as conceded, the State does not have standing as *parens patriae* to bring an action against the federal government.   <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico</u>, 458 U.S. 592, 611, 102 S.Ct. 3260, 3270, n.16 (1982).  It is no part of its duty or power to enforce the rights of citizens in respect of their relations with the federal government.   <u>Id.</u>  The interests asserted with respect to the commercial guide vs. non-commercial guide requirement are attempting to vindicate interests of citizens of the State, those interested in trips into YNP and Grand Teton on a non-commercially guided basis. This interest is represented by the federal government, representing those citizens as *parens patriae,* and is a task properly relegated to the federal government and not petitioners.  The State and Park County do not have proprietary or sovereign interests which would give them standing in this case, in this Court's view.  The loss of potential, hypothetical revenues that petitioners claim could arise from the Final Rule governing use of snowmobiles in the Parks are speculative and are not sovereign or proprietary interests that support a finding of standing.  Additionally, it is difficult to see how shifting use and access from the national parks into the national forests, which are all managed by federal agencies, causes the State and Park County to suffer any

increased environmental risk of harm and concrete and particularized injuries of their own.  The increased risk of environmental harm would be to the national forest.

Here, none of the petitioners have alleged any increased risk of environmental harm resulting from any alleged uninformed agency decision. Furthermore, all asserted injuries are not concrete or particularized flowing from any agency procedural failure or from adoption of the 2009 Rules in this case.  The injuries complained of are speculative, conjectural and hypothetical. The State and Park County have not carried the burden to adduce facts showing that the agency's choices have been or will be made in such manner as to produce causation and permit redressability of any claimed injury. The Court finds that the petitioners, State of Wyoming, Park County and intervenor International Snowmobiles Manufacturers Association do not have standing in this case and that their claims must be dismissed for lack of subject matter jurisdiction.

Accordingly, for the foregoing reasons, it is hereby

**ORDERED** that the NPCA's motion for transfer should be, and hereby is, **DENIED.  It is further**

**ORDERED** that the NPCA's motion to dismiss for lack of standing shall be, and is, **GRANTED.  It is further**

**ORDERED** that the above captioned matters shall be, and hereby are, **DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.**

Dated this _17th_ day of _September_ 2010.

UNITED STATES DISTRICT JUDGE